IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DECTOR ROBINSON,

                    Plaintiff,

    v.                                                       OPINION and ORDER

ANTHONY HENTZ, PAULINE HULSTEIN,                    19-cv-258-jdp
and TAMMY MAASSEN,

                    Defendants.

---

Plaintiff Dector Robinson was a prisoner at Jackson Correctional Institution when he had a series of strokes. Robinson alleges that defendants Anthony Hentz and Pauline Hulstein, both nurses at the prison, ignored signs that he was having a stroke. Robinson also alleges that defendant Tammy Maassen, the prison's health services manager, failed to properly train Hentz and Hulstein. The court has recruited pro bono counsel to represent Robinson.

Defendants move for summary judgment. Dkt. 36. Defendants show that nurses Hentz and Hulstein responded appropriately to Robinson's symptoms and screened him for a possible stroke. When Robinson exhibited symptoms of stroke, he was immediately taken by ambulance to the hospital for treatment. Because there is no underlying Eighth Amendment violation, Robinson's claim against Maassen for failing to train and supervise Hentz and Hulstein also fails. In any case, Robinson has adduced no evidence that Maassen failed to adequately train prison health services staff. The court will grant defendants' motion.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

Robinson was incarcerated at Jackson Correctional Institution (JCI) when he suffered a stroke. Defendants are Department of Corrections employees who work at JCI. Anthony Hentz and Pauline Hulstein are registered nurses. Tammy Maassen, also a registered nurse, is JCI's health services manager.

Around 6:30 a.m. on October 8, 2018, Robinson became dizzy and could not stand. He asked another inmate to alert correctional officers to his condition. Correctional officers arrived at Robinson's cell a few minutes later. Robinson told the officers he couldn't feel the right side of his body, that his face was numb, and that he was having difficulty breathing. The officers called the Health Services Unit (HSU) and were told to bring Robinson to the HSU.

Security staff brought Robinson to the HSU by wheelchair. Nurses Hentz and Hulstein saw Robinson in the HSU infirmary at around 6:45 a.m. Robinson's complaints included headache and face numbness. After Hulstein completed the initial assessments, she contacted Debra Tidquist, an advanced practice nurse practitioner, to report Robinson's complaints and her observations. Tidquist ordered Toradol for Robinson's headache. Robinson received an injection of Toradol at 7:06 am.

A few minutes after the injection of Toradol, Robinson complained about numbness in his face and tongue. Hulstein assessed Robinson and completed a neurological evaluation, using the HSU protocol for neurological problems. The protocol instructs nurses to assess characteristics including eye movement, mental status, gait, and motor function. The protocol incorporates the "FAST" stroke screening tool. FAST is an acronym that stands for (1) Facial droop (weakness on one side of the face); (2) Arm weakness; (3) Speech difficulty (slurring or difficulty expressing words); (4) Time to call 911. During the neurological evaluation, Hulstein assessed Robinson's facial symmetry, arm strength, and the characteristics of his speech. She

observed that his face was symmetrical, rated him "strong" in both left and right extremities, and noted that his speech was soft, but not slurred. The nurses kept Robinson in the HSU for further evaluation.

At 7:25 a.m., Hulstein took Robinson's blood pressure, which was 179/116. She performed a second test about a minute later, which showed his blood pressure was 149/99. His blood pressure was high, but Hulstein thought that was consistent with a person experiencing pain and anxiety.

At 8:14 a.m., Hulstein rechecked Robinson's blood pressure; it had decreased to 142/95. Hulstein conducted another neurological assessment. She observed that Robinson's face was symmetrical, his pupil reaction was brisk, and his speech was soft, but not slurred.

At 9:23 a.m., Hulstein performed a third check on Robinson. Robinson was sleeping when Hulstein entered the room; the court infers that Hulstein woke Robinson to assess him. She observed that Robinson had strength in all four extremities and was able to grip without difficulty.

At noon, Hentz checked on Robinson. Robinson was sleeping; again the court infers that Hentz woke Robinson to assess him. Robinson's blood pressure had decreased to 130/74. But Hentz observed that Robinson had slurred speech and that his extremities were weaker on his right side. Dkt. 46-5 at 1. Hentz then asked nurse practitioner Tidquist and Dr. Lily Liu, a physician at JCI, to examine Robinson. Dkt. 39-1 at 9, 11. Based on the observations of slurred speech and right-sided numbness and weakness, Liu decided to send Robinson by ambulance to Black River Memorial Hospital, a bit less than five miles away.

The record does not expressly show when Robinson arrived at the hospital, but his vitals were obtained at the hospital at 12:57 p.m. He received a CT scan at 1:02 p.m. The scan revealed no hemorrhage but suggested a small vessel stroke.

Defendant Maassen did not personally provide any medical care to Robinson on October 8, 2018, nor was she notified of any issues on that day. Maassen became aware of Robinson's complaints of inadequate medical care only in November 2018 when she was contacted by the institution complaint examiner in regard to a grievance filed by Robinson.

ANALYSIS

**A. Robinson's claims against defendants Hentz and Hulstein**

The Eighth Amendment prohibits prison officials from acting with conscious disregard towards prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). All agree that Robinson's stroke was a serious medical need, so the question is whether defendants consciously disregarded Robinson's symptoms. A defendant "consciously disregards" an inmate's medical need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). Inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Defendants did not ignore Robinson's symptoms or refuse him care. Hentz and Hulstein saw Robinson immediately upon his arrival to the HSU. They took note of his symptoms, administered treatment for his pain, kept him in the HSU for monitoring, and

performed checks on him throughout the morning. The receipt of some medical care does not automatically defeat a claim for constitutionally inadequate care, but Robinson would have to show that the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' a medical condition." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (quoting *Snipes*, 95 F.3d 586 at 592). The care provider's conscious disregard can be inferred if the provider "persists in a course of treatment known to be ineffective" or a provider's decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016). But no reasonable juror could conclude that Hentz and Hulstein demonstrated conscious disregard of Robinson's medical needs.

      Defendants' expert, Dr. Edward Bradbury, is the medical stroke director for UW Hospital and Unity Point-Meriter. Bradbury says the FAST screening tool that was part of the HSU protocol is an appropriate screening tool for strokes. Bradbury opined that the treatment by Hentz and Hulstein met the applicable standard of care and that Robinson had not exhibited signs of stroke until the noon check, at which point Hentz appropriately sought additional care and Robinson was sent to the hospital. Bradbury also opined that once Robinson exhibited signs of stroke it would have been too late to administer Alteplase—the only FDA approved medication for acute ischemic stroke treatment. Alteplase must be administered within four and a half hours of the patient's last normal state. Because Robinson reported at the hospital that he had first experienced symptoms at 4 a.m., it would have been

5

too late to administer Alteplase after about 8 a.m. Robinson has adduced no expert evidence of his own to rebut Bradbury's opinions.[1]

Robinson's main argument in opposition to the motion for summary judgment is that the nurses ignored or misinterpreted some of the signs that he was having a stroke. Robinson says that he really was having difficulty speaking and that his right side was numb and weak when Hulstein first evaluated him. Because the defendant nurses did not document all of his symptoms, the argument goes, Bradbury's expert opinion that the nurses followed the standard of care should be disregarded. The court is not persuaded.

Even if the defendant nurses missed some of Robinson's symptoms, the undisputed evidence shows that they considered the possibility of stroke and took the risk seriously. The nurses promptly treated his pain, and they performed neurological evaluations throughout the morning. They applied the FAST diagnostic tool and assessed Robinson's facial symmetry, speech, and arm strength several times. When Hentz noticed Robinson's slurred speech and right-side weakness, Hentz immediately contacted nurse practitioner Tidquist and Dr. Liu, and Robinson was taken to the hospital by ambulance. Robinson has adduced no evidence that following the FAST protocol was incorrect, and certainly no evidence that it was such a substantial departure from accepted medical practice as to demonstrate conscious disregard of his medical needs. Robinson may have reported other symptoms, but the defendant nurses directly examined him for the symptoms that would indicate a stroke under the FAST

---

[1] Robinson identified one of the Black River Memorial Hospital physicians, Dr. Rajasekaran, as a "hybrid" expert witness. Dkt. 34. But Robinson did not disclose an expert report to support her testimony as a retained expert. In her deposition, Rajesekaran disclaimed any intent to offer expert testimony, and she offered no testimony that would contradict Bradbury's opinions. Dkt. 47.

framework. They failed to diagnose his stroke, but an error of medical judgment, even if it were one, is not an Eighth Amendment violation.

Robinson also criticizes some of the nurses' specific decisions. He says the nurses should have performed hourly wellness checks and done more to "further explore" his symptoms. Dkt. 44 at 7. But the nurses did perform hourly checks for about three hours, until about 9:30 a.m. Although they then let him sleep until noon, Robinson does not explain how that harmed him. The next hourly check would have been at 10:30 a.m., which, as Bradbury explained, would have been too late for Alteplase. Robinson also says the nurses should have treated him for a hypertensive crisis following his first blood pressure reading. The court did not grant Robinson leave to proceed on a claim regarding treatment for hypertension. In any case, Robinson hasn't adduced evidence that the nurses consciously disregarded his high blood pressure. The nurses kept Robinson in the HSU for monitoring after administering the Toradol for pain. Robinson's blood pressure then moderated to a level consistent with a patient experiencing pain and anxiety.

Robinson says that there is a question of material fact as to whether his symptoms "even remotely hinted at the possibility he was suffering a stroke and required emergent treatment out of an abundance of caution." Dkt. 44 at 8. Robinson has adduced no evidence that the standard of care requires emergency treatment at any hint of a stroke. To show that Hentz and Hulstein consciously disregarded his medical needs, Robinson would have the burden to show that "that no minimally competent professional would have [] responded" to Robinson's symptoms the way defendants did. *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). Robinson has not adduced evidence on which he could meet his burden of proof. Defendants are entitled to summary judgment on his claims against Hentz and Hulstein.

**B. Robinson's claim against defendant Maassen**

Robinson also brings an Eighth Amendment claim against defendant Health Services Manger Tammy Maassen. In actions under § 1983, such as this one, supervisors are not automatically liable for the wrongful acts of those they supervise. To succeed on his claim against Maassen, Robinson must prove that Maassen was "personally responsible for the deprivation of the constitutional right." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 1995) (internal citation omitted). Maassen did not provide any care to Robinson, so Robinson's claim rests on the allegation that Maassen failed to properly train the nurses or adequately manage the HSU.

The court has already concluded that Hentz and Hulstein committed no constitutional violation, so there is nothing for Maassen to be held responsible for. Moreover, Robinson has adduced no evidence that Maassen failed to properly train Hentz and Hulstein or otherwise mismanaged the HSU. To the contrary, the evidence shows that HSU nurses were instructed how to diagnose and respond to a stroke by applying the HSU protocol. Robinson says that there is "other evidence" of inadequate training beyond this single incident of misdiagnosis, Dkt. 44 at 21, but he does not provide it: he does not point to any policy he alleges is inadequate or demonstrate that HSU staff is not actually trained on the nursing protocols. Indeed, Robinson adduces no evidence that Maassen was even aware a problem in how the HSU treats potential stroke patients. *See Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002) (holding that supervisors must be aware of a substantial risk of harm to be liable). Maassen is entitled to summary judgment.

Because the court is granting summary judgment on the merits of Robinson's claims, the court does not need to consider defendants' arguments about qualified immunity.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 36, is GRANTED.

2. The clerk of court is directed to enter judgment for defendants and close this case.

Entered September 21, 2021.

                        BY THE COURT:

                        /s/

                        _____
                        JAMES D. PETERSON
                        District Judge